**FILED**
AUG 12 2011
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BACKCOUNTRY AGAINST DUMPS; et al., <br><br> Plaintiffs, <br><br> vs. <br><br> JIM ABBOTT; et al., <br><br> Defendants. | CASE NO. 10-cv-1222 BEN (BGS) <br><br> **ORDER DENYING PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** <br><br> [Docket No. 185] |

Presently before the Court is Plaintiffs' Motion for Injunction Pending Appeal. For the reasons set forth below, the Court **DENIES** Plaintiffs' Motion for Injunction Pending Appeal.

## BACKGROUND

This case arises from the "Sunrise Powerlink Project," a 117-mile transmission line projected to run Northwest from Imperial County to San Diego County, in California. As approved, the transmission line, which is supported by massive towers except for an underground segment in Alpine, runs along the Final Environmentally-Superior Southern Route. Plaintiffs Backcountry Against Dumps, The Protect Our Communities Foundation, East County Community Action Coalition, and Donna Tisdale seek to preserve the serene rural community in East San Diego County.

On February 16, 2010, Plaintiffs filed a complaint in district court, challenging decisions by two federal agencies, specifically the Bureau of Land Management ("BLM") and the Fish and Wildlife Service ("FWS"). According to Plaintiffs, these decisions were critical to the approval and

development of the Sunrise Powerlink. (Docket No. 1.) SDGE intervened on the grounds that it is building the $1.9 billion transmission line. The operative complaint is the First Amended Complaint, filed on November 5, 2010. (Docket No. 41.)

Plaintiffs contend that Defendants violated several federal statutes, including the National Environmental Policy Act, 42 U.S.C. §§ 4321-70; Federal Land Policy Management Act, 43 U.S.C. §§ 1701-87; Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-44; and National Historic Preservation Act, 16 U.S.C. §§ 470 et seq. Plaintiffs challenge several stages of the environmental review process by the BLM and FWS. With respect to the BLM, Plaintiffs challenge the Record of Decision ("ROD") dated January 20, 2009. (Docket No. 50-1, at 1-2.) The ROD was based on an October 2008 Final Environmental Impact Statement ("EIS") and granted two Rights-of-Way to facilitate the Sunrise Powerlink Project. (AR:A:722; A:1052.) Plaintiffs also challenge the BLM's resource management plan ("RMP") of October 2008. (AR:A:1051.) With respect to the FWS, Plaintiffs challenge its Biological Opinion of January 2009. (Docket No. 50-1, at 6, 22.)

Prior to filing this lawsuit, on March 25, 2009, Plaintiffs had appealed the BLM's ROD to the Interior Board of Land Appeals ("IBLA") and sought a stay. (AR:A:586; A:592.) On July 14, 2009, the IBLA denied the stay. (AR:A:403.) Although Plaintiffs contend that the IBLA was then divested of jurisdiction (First Am. Compl. ¶¶ 31-32), on May 14, 2010, while this action was pending in district court, the IBLA issued its decision affirming the ROD. (Docket No. 52, at 6.)

Plaintiffs, Defendants, and SDGE filed motions for summary judgment. (Docket Nos. 50, 53, 56.) On June 30, 2011, the Court granted Defendants' Motion for summary judgment, and denied both Plaintiffs' and SDGE's motions for summary judgment as moot. The Court also denied Plaintiffs' motion for preliminary injunction as moot. Plaintiffs appealed (1) the order denying Plaintiffs' motion for a preliminary injunction as moot, and (2) the order granting the Defendants' motion for summary judgment and denying Plaintiffs' motion for summary judgment. Plaintiffs filed an emergency motion for injunctive relief in the Ninth Circuit Court of Appeals, which was denied without prejudice to its renewal following presentation to the District Court.

Presently before the Court is Plaintiffs' Motion for Injunction Pending Appeal. In conjunction with this Motion, Plaintiffs filed an Ex Parte Motion to Shorten Time for Briefing and Hearing of

Plaintiffs' Motion for Injunction Pending Appeal ("Ex Parte Motion"). (Docket No. 186.) In the Ex Parte Motion, Plaintiffs Backcountry Against Dumps, The Protect Our Communities Foundation, East County Community Action Coalition, and Donna Tisdale requested that the Court "direct[] that plaintiffs' Motion for an Injunction Pending Appeal be decided on the papers without a hearing," *i.e.*, that the hearing be cancelled. (Docket No. 186, at 1.) Neither Defendants nor SDGE opposed the request to vacate the hearing. The Court granted the Ex Parte Motion in part, scheduling a hearing for August 12, 2011. The Court then vacated the hearing pursuant to Local Civil Rule 7.1.d because (1) Plaintiffs extensively briefed the issues not only in the present Motion for Injunction Pending Appeal, but also in their previous Motion for Summary Judgment (Docket No. 50) and Motion for Preliminary Injunction (Docket No. 121), and (2) Plaintiffs Backcountry Against Dumps, The Protect Our Communities Foundation, East County Community Action Coalition, and Donna Tisdale requested that the hearing be vacated.

## DISCUSSION

According to Federal Rule of Civil Procedure 62(c), "While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Rule 62(c), however, "does not restore jurisdiction to the district court to adjudicate anew the merits of the case." *Natural Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) (internal quotation marks omitted).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

An injunction pending appeal is "not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 129 S. Ct. 1749, 1760 (2009) (internal quotation marks omitted). Instead, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 21. The determination whether to grant an injunction is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the

circumstances of the particular case." *Nken*, 129 S. Ct. at 1760 (internal quotation marks omitted). Furthermore, there is no presumption that an injunction should issue, even in environmental cases. *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) ("Our law does not . . . allow us to abandon a balance of harms analysis just because a potential environmental injury is at issue."), *overruled in part on other grounds by Winter*, 555 U.S. at 20, *as recognized by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009); *id.* ("[W]e decline to adopt a rule that *any* potential environmental injury *automatically* merits an injunction, particularly where . . . the plaintiffs are not likely to succeed on the merits of their claims.").

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

The Court will only consider the arguments raised by Plaintiffs that directly challenge the findings of the June 30 Order, as these arguments are dispositive.

### A. The BLM's Record of Decision and Environmental Impact Statement

In the June 30 Order, the Court found that it could not determine the merits of the complaint because Plaintiffs failed to challenge the final agency action. Specifically, Plaintiffs challenged the ROD and EIS, rather than the IBLA's decision after appeal affirming the BLM's ROD and EIS. Accordingly, the Court found that Plaintiffs' claims based on the ROD and EIS failed as a matter of law.

Plaintiffs argue that "[t]his Court's interpretation of 43 C.F.R. §§ 4.21(a)(3) and 4.403 contradicts well-settled Ninth Circuit precedent and the plain language of BLM's regulations by holding that IBLA's May 2010 dismissal of Plaintiffs' appeal, issued months *after* this action was filed on February 16, 2010, trumped this Court's extant jurisdiction over BLM's ROD." (Pl. Mot. at 6.) Specifically, Plaintiffs argue that "[w]hen IBLA failed to grant a stay, it forfeited jurisdiction. BLM's ROD then became the final agency action. Because under BLM's regulations its ROD was *no longer inoperative*, plaintiffs were therefore free to challenge that ROD in federal court." (*Id.*) In support of this proposition, Plaintiffs cite *National Parks & Conservation Association v. Bureau of Land Management*, 606 F.3d 1058 (9th Cir. 2010), *Desert Citizens Against Air Pollution v. Bisson*, 231 F.3d 1172 (9th Cir. 2000), *Center for Biological Diversity v. U.S. Department of Interior*, 255 F. Supp. 2d 1030 (D. Ariz. 2003), and *Darby v. Cisneros*, 509 U.S. 137 (1993).

As the Court explained in the June 30 Order, these cases are inapposite. *Center for Biological*

1  *Diversity*, *National Parks*, and *Desert Citizens* present different factual circumstances. In those cases,
2  the IBLA entered a final decision and the plaintiffs challenged that decision. Those circumstances are
3  not present here. Unlike the plaintiffs in *Biological Diversity*, Plaintiffs did not seek leave to amend
4  their complaint when the IBLA issued its final decision, insisting instead that they need not do so. (*See*
5  Docket Nos. 67, 84, 85 in *Center for Biological Diversity v. U.S. Dep't of Interior*, Case No. 01-CV-
6  1758 ROS, United States District Court for the District of Arizona.) In addition, *Darby* does not stand
7  for the proposition that once an agency decides to award intermediate relief, further exhaustion of
8  remedies is not required. Rather, *Darby* held that "[w]hen an aggrieved party has exhausted all
9  administrative remedies expressly prescribed by statute or agency rule, the agency action is final for
10  the purposes of [§ 10(c) of the APA] and therefore subject to judicial review [under § 10(a) of the
11  APA]." *Darby*, 509 U.S. at 146 (internal quotation marks omitted).

### B. BLM's Resource Management Plan

In the June 30 Order, the Court found that the RMP is not a final agency action and, therefore, not reviewable by this Court. Specifically, the Court noted that the RMP is a regional land management plan for East San Diego County, because it describes the goals, objectives, and management plans for the project, rather than authorizes specific activity. The Court could not determine what impact results from the RMP without knowing specifically what permits will be made or granted in the future and what remedial programs will be imposed to fight the impact. As further review and permits are required for any action, the RMP did not mark the consummation of the agency's decision-making process, nor did it determine the rights or obligations of any party.

In the June 30 Order, the Court relied on *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 65 (2004), for the proposition that "Courts have found that resource management plans challenging a discrete final agency action that authorize site-specific activities are reviewable by this Court; however, programmatic challenges to a plan as a whole are not." (June 30 Order, at 6.) Plaintiffs argue that *Norton* is inapplicable to the present case because "in that case plaintiffs challenged BLM's *inaction* in failing to curtail off-road vehicle use of wilderness study areas. Here, by contrast, BLM *took* final agency action to *allow* massive, tangible development of federal lands." (Pl. Mot. at 8.) As stated in the June 30 Order, to be reviewable by this Court, the RMP must be a "final agency action" for purposes of the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 702,

704. Section 551(13) defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Agency action, therefore, includes both acts and failures to act. This distinction does not alter the rule that a plaintiff may challenge only "discrete agency action[s]," while "broad programmatic attack[s]" are precluded. *Norton*, 542 U.S. at 64; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998).

In addition, Plaintiffs cite *Oregon Natural Desert Association v. U.S. Bureau of Land Management*, 625 F.3d 1092 (9th Cir. 2010), *Friends of Yosemite Valley v. Norton*, 348 F.3d 789 (9th Cir. 2003), *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062 (9th Cir. 2002), and *California Wilderness Coalition v. U.S. Department of Energy*, 631 F.3d 1072 (9th Cir. 2001), for the proposition that courts may review federal agency land use plans that allow development. These cases, however, are inapposite. *Oregon Natural Desert Association*, *Kern*, and *California Wilderness Coalition* all involve circumstances in which the agency failed to issue an EIS or give any consideration to the impacts of a RMP. *See Or. Natural Desert Ass'n*, 625 F.3d at 1103 (BLM "explicitly disclaimed any general obligation to analyze the impacts of its Plan on wilderness values, or to consider management options for areas with those values, and took no action contrary to that statement"); *Kern*, 284 F.3d at 1078 (proposed RMP did not contain an "EIS analyzing the impact of reasonably foreseeable future timber sales within the Coos Bay District"); *Cal. Wilderness Coal.*, 631 F.3d at 1096-1106 (agency failed to issue an EIS or an Environmental Assessment). Such is not the case here. In addition, *Norton* is similarly inapplicable. That case discussed when "NEPA requires a full evaluation of site-specific impacts," and found that the CMP's EIS contained sufficient specific data and information for the CMP to be prepared as a programmatic document. *Norton*, 348 F.3d at 801. Whether the RMP was properly prepared as a programmatic document is not at issue here.

### C. Plaintiffs' Claims Based on FWS' Biological Opinion

The June 30 Order found that Plaintiffs' claims challenging the January 2009 biological opinion based on the deferral of species surveys and FWS' Incidental Take Statement were moot. The Court also found that Plaintiffs' claims based on the scope of the biological opinion lacked merit because Plaintiffs failed to establish that FWS must consider "connected" projects in its biological opinion. Plaintiffs did not challenge these findings of the Court. Accordingly, the Court will not address these findings here. Overall, Plaintiffs have not shown a likelihood of success on the merits.

## II. LIKELIHOOD OF IRREPARABLE HARM

As a preliminary matter, the parties disagree about whether there is a presumption of irreparable harm in environmental cases. In support of the proposition that irreparable harm is presumed, Plaintiffs cite *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Although it is true that "[t]he Supreme Court has instructed us that environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable," "this does not mean that any potential environmental injury warrants an injunction." *Id.* (internal quotation marks omitted). In addition, Plaintiffs argue that "[i]rreparable damage is *presumed* when an agency fails to evaluate thoroughly the environmental impact of a proposed action." (Pl. Reply at 4 (quoting *Save Our Ecosys. v. Clark*, 747 F.2d 1240, 1250 (9th Cir. 1984)).) Here, however, the Court has not found that the agency failed to thoroughly evaluate the environmental impact of Sunrise Powerlink.

Plaintiffs argue that their "use of the federal lands along the Powerlink route, including the McCain Valley, will be irreparably harmed by Powerlink." (Pl. Mot. at 2.) Plaintiffs note that "BLM's FEIS admits that the Project will have *at least* 41 'significant, *unmitigable* impacts' to environmental resources." (*Id.* (quoting AR:A:1052:42107-08, 42171, 45803-06).) The EIS' identification of significant and unmitigable impacts, however, are not per se irreparable harms. *See McNair*, 537 F.3d at 1005 ("declin[ing] to adopt a rule that *any* potential environmental injury *automatically* merits an injunction").

In addition, Plaintiffs list several specific injuries that they argue will result from the construction of Sunrise Powerlink. First, Plaintiffs argue that Sunrise Powerlink will "destroy the majestic wildlands and visual splendor of the McCain Valley's unparalleled desert beauty" and "degrade the extraordinary scenery, spiritual and cultural value, and recreational use of the nearby Carrizo Gorge Wilderness Area, Table Mountain Area of Critical Environmental Concern, Coyote Mountains Wilderness Area, Jacumba Wilderness Area, and Yuha Desert." (Pl. Mot. at 3.) In fact, Sunrise Powerlink avoids the federally designated Wilderness Areas, and does not pass through the Table Mountain Area of Critical Environmental Concern. (Woldemariam Decl. ¶¶ 32, 33.) Sunrise Powerlink does pass through the Yuha Desert, but only within a federally designated energy corridor, co-located with Southwest Powerlink. (*Id.* ¶ 31, Exh. 3.) As for visual impacts of Sunrise Powerlink,

the area already contains manmade structures, such as Southwest Powerlink, Interstate 8 (a four-lane highway), three mining districts, and a right-of-way for wind energy site testing and monitoring. (AR:A:1445:59440, 59442.)

Second, Plaintiffs argue that Sunrise Powerlink will "cut through thousands of acres of designated Critical Habitat of the Peninsular bighorn sheep," "slice through 39 acres of designated Critical Habitat of the endangered Quino checkerspot butterfly," and "encroach on 122 acres of proposed Critical Habitat for the endangered Arroyo toad, 168 acres managed for the flat-tailed Horned lizard, and 743 acres of sensitive vegetative communities, and impact 9 golden eagle nests." (Pl. Mot. at 3.) Plaintiffs exaggerate this alleged harm to the environment. The U.S. Fish and Wildlife Service has found that Sunrise Powerlink will not jeopardize the Quino checkerspot butterfly, arroyo toad, or Peninsular bighorn sheep, or destroy or adversely modify their designated critical habitat. (2010 BiOp [Docket No. 55], at 81-120.) The FWS also found that Sunrise Powerlink is not likely to jeopardize the continued existence of the flat-tailed horned lizard. (*Id.* at 120-34.) Sunrise Powerlink will in fact impact 266 acres on BLM land. (Colton Decl. ¶ 19.) Lastly, there are in fact three Golden Eagle nests on BLM land, two of those within 4,000 feet of where Sunrise Powerlink will be located. (*Id.* ¶ 40.)

Third, Plaintiffs argue that Sunrise Powerlink will "create severe wildfire hazards by impeding fire suppression." (Pl. Mot. at 3.) The BLM does acknowledge that Sunrise Powerlink entails wildfire and fire suppression risks. (*See, e.g.*, AR:A:1052:46320, 46473, 46793.) On the other hand, fire risks assume a strung and energized line, which will not occur until mid-2012. (Shreve Decl. ¶ 13 [Docket No. 159].) The Ninth Circuit is expected to resolve Plaintiffs' appeal by this time, which moots this concern for an injunction pending appeal.

Fourth, Plaintiffs argue that Sunrise Powerlink will "destabilize steep slopes and trigger erosion and permanent loss of vegetation." (Pl. Mot. at 4.) The FEIS, however, addresses impacts to water resources, including erosion and sedimentation, and outlines mitigation measures that will reduce such impacts to levels that are less than significant. (AR:A:1052:46753, 46754.) Overall, the Court finds that some environmental harm is likely to result if an injunction is not issued pending appeal, although not to the extent that Plaintiffs claim.

### III. BALANCE OF EQUITIES AND THE PUBLIC INTEREST

Plaintiffs argue that the balance of equities and the public interest favor granting an injunction pending appeal because (1) Sunrise Powerlink will cause environmental injury, (2) SDGE "will not experience a shortfall of transmission capacity if Sunrise [Powerlink] is delayed or never built," (3) "[e]njoining Powerlink would not prevent development of less impactful renewable energy," and (4) SDGE "can obtain full recovery of all abandoned costs related to the Powerlink." (Pl. Mot. at 4 (internal quotation marks omitted).) In their Reply, Plaintiffs also argue that it is in the public interest to ensure that BLM complied with the requirements of NEPA before the project continues forward.

First, the harm to the environment that Plaintiffs argue will result has been discussed above. Second, in regards to providing electricity, Plaintiffs argue that SDGE will not experience a shortfall of transmission capacity if Sunrise Powerlink is delayed, Sunrise Powerlink will create a power surplus, and the additional generation from Sunrise Powerlink is not needed until 2020 at the earliest, citing Powers' Declaration, ¶¶ 3, 4-19. Mr. Powers' arguments, however, were rejected by the California Public Utilities Commission ("CPUC"). (Strack Decl. ¶¶ 13-18, 25.) The CPUC found that Sunrise Powerlink will be needed to ensure reliable delivery of electricity to the San Diego area "by 2014 and perhaps sooner given the many uncertainties inherent in" its analytical model. (AR:A:789:39550, 39552.)

Third, in regards to the development of renewable energy, "[Sunrise Powerlink] . . . will facilitate the development of renewable resources, thus advancing state policy to reduce GHG emissions." (AR:A:789:39552; *see also* A:789:39274 ("[A]pproval of [Sunrise Powerlink] will help to unlock the potential of one of the richest renewable energy regions in California."); A:722:38464; Strack Decl. ¶ 39-48.) Plaintiffs' argument to the contrary was also rejected by the CPUC. (*See* Strack Decl. ¶ 25.) The development of renewable energy is a national energy priority. *See* Energy Policy Act of 2005, Pub. L. 109-58, § 211, 119 Stat. 594, 660 (2005) (requiring 10,000 MW of renewable energy on public land by 2015).

Fourth, in regards to BLM's compliance with NEPA, it is true that "Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward." *S. Fork Bank Council of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 588 F.3d 718, 728 (9th Cir. 2009). In *South Fork Bank Council*, however, the

plaintiffs "show[ed] a likelihood of success on the NEPA claims because there was inadequate study of the serious effects of processing refractory ore and exhausting scarce water resources." *Id.* Such is not the case here.

The completion of Sunrise Powerlink has additional benefits. "[Sunrise Powerlink] will generate over $115 million per year in net benefits" to consumers in the form of reduced energy costs. (AR:A:789:39552; A:568:35836, 35837; A:1052:42443.) Plaintiffs' argument that money would be saved if Sunrise Powerlink were not built has already been rejected by the CPUC. (*See* Strack Decl. ¶¶ 49-53, 60.) Furthermore, additional delay would increase the costs of constructing Sunrise Powerlink by $16 to 22 million per month (Woldemariam Decl. ¶¶ 84-92; Colton Decl. ¶ 45). In addition, SDGE has already employed 450 to 500 people to construct Sunrise Powerlink, and plans to employ 650 to 700 people at the peak of construction. (Woldemariam Decl. ¶ 84.) Maintaining jobs is in the public interest. *See McNair*, 537 F.3d at 1005.

Plaintiffs argue that the Court should not consider economic harm when deciding whether injunctive relief is appropriate, citing *Parker v. United States*, 309 F. Supp. 593 (D. Colo. 1970), *Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152 (9th Cir. 1988), and *Cady v. Morton*, 527 F.2d 786 (9th Cir. 1975). In *Parker*, the court found that the defendants did not comply with federal environmental law because the region at issue was not included in the study report to the President and Congress. *Parker*, 309 F. Supp. at 601. Such is not the case here. In addition, *Hodel* and *Morton* instruct agencies to not consider a party's preexisting investments when approving an EIS; they do not instruct courts to not consider economic harm when determining whether to issue an injunction. *See Hodel*, 851 F.2d at 1157; *Morton*, 527 F.2d at 798. On the contrary, courts may consider economic harm when determining whether to grant injunctive relief. *See, e.g., Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) ("Economic harm may indeed be a factor in considering the balance of equitable interests."); *McNair*, 537 F.3d at 1005 (balance of harms did not tip in environmental organization's favor where a Forest Service project would "further the public's interest in aiding the struggling local economy and preventing job loss"). Overall, Plaintiffs have not shown that the balance of equities and public interest favor granting an injunction pending appeal.

## IV. OVERALL BALANCE OF HARMS ANALYSIS

The Court finds that some environmental harm is likely to result if an injunction is not issued pending appeal. The Court also finds, however, that Plaintiffs have not shown that they are likely to succeed on the merits or that the balance of equities and the public interest favor granting an injunction. Accordingly, the overall balance of harms analysis does not favor granting Plaintiffs an injunction pending appeal. *See McNair*, 537 F.3d at 1005 ("[W]e decline to adopt a rule that *any* potential environmental injury *automatically* merits an injunction, particularly where . . . the plaintiffs are not likely to succeed on the merits of their claims.").

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Injunction Pending Appeal is **DENIED**.

**IT IS SO ORDERED.**

DATED: August 12, 2011

HON. ROGER T. BENITEZ
United States District Court Judge